UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MELISSA B., o/b/o J.B.,      :
    Plaintiff,             :
                             :
v.                           :   C.A. No. 23-518-MSM
                             :
MARTIN O'MALLEY,             :
COMMISSIONER, SOCIAL SECURITY :
ADMINSTRATION,               :
    Defendant.             :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Before the Court is the motion of Melissa B. ("the mother") on behalf of her school-age – now nine-years-old – son, J.B. ("Plaintiff"), for reversal of the decision of the Commissioner of Social Security (the "Commissioner") denying his second application for supplemental security income ("SSI") by erroneously finding less than marked limitations in one of the six functional domains listed in 20 C.F.R. § 416.926a(b)(1) – Plaintiff's ability to care for himself. ECF No. 10. Plaintiff's first application was denied on December 11, 2020, Tr. 58-68; Plaintiff's second application was filed on June 30, 2021, which is also Plaintiff's amended alleged onset date. Tr. 17, 34.

Following a hearing on the second application, an administrative law judge ("ALJ") supportably found that Plaintiff has the severe impairments of attention deficit hyperactivity disorder ("ADHD"), adjustment disorder with mixed disturbance of emotions and conduct, and speech-language delay, but that, despite Plaintiff's allegation on application, there is no medical evidence supporting a diagnosis of autism. Tr. 18. In substantial reliance of the prior administrative findings of two psychologists, who interpreted *inter alia* the assessment of

Plaintiff kindergarten teacher, as well as his own review of the evidence of record, the ALJ found that Plaintiff has no limits in the domain of health and physical well-being, that he has marked limits in the domain of interacting with and relating with other and that he has less than marked limits in the other pertinent domains.[1]  Based on these findings, the ALJ concluded that Plaintiff has not been disabled at any relevant time.  Tr. 25.  Plaintiff now alleges that the ALJ erred in failing to consider subjective statements and records that support a finding of marked limitations in the domain related to self-care, as well as that, as related to self-care, the ALJ erroneously found that "no other deficits were noted in the household," Tr. 22, ignoring the many references to Plaintiff's deficits at home.

The Commissioner's countermotion asserts that the ALJ's decision is consistent with applicable law and sufficiently supported by the evidence.  ECF No. 12.  The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      Standard of Review

As long as the correct legal standard is applied, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g), 1383(c)(3); see Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 587 U.S. 97, 103 (2019).  Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Though the difference is quite subtle, this standard is "somewhat less strict"

---

[1] These are the domains of acquiring and using information; attending and completing tasks; moving about and manipulating objects; and the ability to care for himself.

2

than the "clearly erroneous" standard that appellate courts use to review district court fact-finding. Dickinson v. Zurko, 527 U.S. 150, 153, 162-63 (1999) (cited with approval in Biestek, 587 U.S. at 103). Thus, substantial evidence is more than a scintilla – it must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).

Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987); Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Frustaglia v. Sec'y of Health & Hum. Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999); see Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (per curiam) (court must consider evidence detracting from evidence on which Commissioner relied). The Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner. Thomas P. v. Kijakazi, C.A. No. 21-00020-WES, 2022 WL 92651, at *8 (D.R.I. Jan. 10, 2022), adopted by text order (D.R.I. Mar. 31, 2022).

## II. Childhood Disability Determination

A child under age eighteen is considered disabled and entitled to SSI benefits if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(C)(i); see Shaniece D. o/b/o A.D. v. O'Malley, C.A. No. 23-112-WES, 2024 WL 79897, at *3 (D.R.I. Jan. 8, 2024), adopted by text order (D.R.I. Mar. 13, 2024). The Social Security regulations include a three-step test for the purpose of adjudicating children's disability claims under this standard. 20 C.F.R. § 416.924(a)-(d). That test requires the ALJ to determine: (1) whether the child is engaged in "substantial gainful activity," (2) whether the child has "a medically determinable impairment[ ] that is severe," and (3) whether the child's "impairment(s) . . . meet, medically equal, or functionally equal [a] list[ed impairment]." 20 C.F.R. § 416.924(b)-(d); see generally Fleetwood v. Colvin, 103 F. Supp. 3d 199, 202-03 (D.R.I. 2015). "The claimant seeking [childhood] benefits bears the burden of proving that his or her impairment meets or equals a listed impairment." Hall ex rel. Lee v. Apfel, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)).

In considering whether a child has an impairment or combination of impairments that functionally equals the severity of a listing, the six functional equivalence domains set forth in the regulations must be considered. 20 C.F.R. § 416.926a(b)(l). They are:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for oneself; and
6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi); SSR 09-2p, 2009 WL 396032, at *1-2 (Feb. 18, 2009). To qualify as functionally equivalent to a listing, the child's impairment "must result in [either] 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."

4

20 C.F.R. § 416.926a(a).  The child has a "marked" limitation – i.e., one "that is 'more than moderate' but 'less than extreme'" – when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  Id. § (e)(2)(i).  The child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  Id. § (e)(3)(i).  According to the guidance in SSR 09-2p, this is a complex and nuanced analysis that requires consideration of the "whole child," including an examination of the child's level of development and functioning in relation to unimpaired peers of the same age, and how the child functions at home, in school, and in the community in each of the six domains without the supports (such as an IEP) that are not needed by unimpaired children of the same age.  See generally, SSR 09-2p, 2009 WL 396032, at *1-11.

As applicable to school-age children, the regulation – 20 C.F.R. § 416.926a – that limns the contours of the fifth domain – self-care – is lengthy and detailed.  As an illustration of its focus and content, a small part of it is set out below:

> (k) *Caring for yourself.* . . .
>> (i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. . . .
>> (ii) . . . Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.
>> . . .
> (2) *Age group descriptors*
>> . . .
>> (iv) *School-age children (age 6 to attainment of age 12).* You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your

>> behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.
> . . .
> (3) *Examples of limited functioning in caring for yourself.* . . .
>> (i) You continue to place non-nutritive or inedible objects in your mouth.
>> (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
>> (iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
>> (iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
>> (v) You do not spontaneously pursue enjoyable activities or interests.
>> (vi) You have disturbance in eating or sleeping patterns.

### A.      Opinion Evidence

To assess opinion evidence, an ALJ must consider the persuasiveness of medical opinions in the case record. See 20 C.F.R. § 416.920c. The most important factors are supportability and consistency; these are usually the only factors the ALJ is required to articulate. 20 C.F.R. § 416.920c(b)(2); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6, 2019). Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding[ ] is with other evidence in the claim." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017). Weighed in light of the evidence of record, the ALJ may consider the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding. See 20 C.F.R. § 416.920c(c)(1)-(5). The Commissioner can also consider evidence from "other sources" to show the severity of the claimant's impairments. SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006); see Christina B. v. Comm'r of Soc. Sec., No. 5:19-CV-1192 (ATB), 2020 WL 5848732, at *6-11 (N.D.N.Y. Oct. 1, 2020) (discussing evidence from

6

special education teacher). In childhood disability cases, teachers and occupational therapists are considered "other sources" whose opinions cannot "establish[ ] the existence of [a] medically determinable impairment," but "can also be very important to our understanding of the severity of a child's impairment(s) and how it affects day-to-day functioning." SSR 09-2p, 2009 WL 396032, at *3-4.

### B.    Reliance on Experts

An ALJ cannot render a medical opinion in the face of conflicting and inconsistent medical evidence from equally persuasive sources without the assistance of a medical expert. Santiago v. Sec'y of Health & Hum. Servs., 944 F.2d 1, 7 (1st Cir. 1991) (per curiam) ("[A]n expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person."). If the medical evidence is such that a "reasonable mind might accept [it] as adequate to support a conclusion" of disability, the ALJ cannot rest on his untutored lay analysis to interpret it otherwise. Sherry B. v. Saul, 518 F. Supp. 3d 590, 591 (D.R.I. 2021) (cleaned up). Further, it is error for an ALJ to deny benefits in reliance on a consulting or a non-examining expert physician or psychologist who, despite expertise, was not privy to parts of the medical record that support the claimed limitations. Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006) (per curiam). However, if the post-file review evidence is consistent with the findings of the non-examining experts, an ALJ can render a commonsense judgment about functional capacity "even without a physician's assessment . . . as long as the [ALJ] does not overstep the bounds of a lay person's competence." Hall, 18 F. Supp. 3d at 151 (cleaned up); see Shaniece D. o/b/o A.D., 2024 WL 79897, at *4.

### III.    Analysis

Plaintiff's principal challenge to the ALJ's determination that Plaintiff's limitations in the fifth domain (the ability to care for self) are less than marked is based on the detailed responses to a domain-based questionnaire prepared by Plaintiff's kindergarten teacher. Tr. 222. As relevant to the fifth domain ("Caring for Himself or Herself"), the teacher rated Plaintiff on ten facets of this domain and provided comments. Tr. 231. As to two of the ten facets, she noted "a serious problem," and, in her comments, noted that there had been some toileting accidents, a failure to ask for help and the need for safe-body reminders. Id. As to the remaining eight facets, she noted "no problem" or an "obvious problem," which is the midpoint on the scale used on the form she used. Id. Plaintiff asks the Court to focus on the "serious problem" checks.

This argument fails because that the ALJ expressly considered this teacher's questionnaire responses and comments, which are complex in that the teacher did not use Social Security parlance for her ratings[2] and because most (eight of ten) of the teacher's responses in the fifth domain were "no problem or "an obvious problem," which may be interpreted "as less than marked," consistent with and supportive of the ALJ's finding. Further, and pivotal to the Court's determination, the ALJ did not rely on his lay experience to interpret this nuanced aspect of the teacher's assessment; to the contrary, this teacher questionnaire was analyzed by two non-examining expert psychologists who interpreted it in light of not only their professional expertise, but also their special knowledge of Social Security standards. They both found that these responses, together with the other relevant evidence, support a limitation of less than marked in the domain of self-care. Mindful of his appropriate reliance on these findings, I find

---

[2] When a teacher uses terminology such as "obvious," "serious," or "very serious problem" to characterize the impact of various functional facets within any of the six domains, expertise may be required to interpret the responses because such terms are not necessarily equivalent to the rating categories – "marked" and "extreme" – that are used in the Social Security context. See Leanne B. v. O'Malley, C.A. No. 23-100-MSM, 2024 WL 862280, at *3 n.6 (D.R.I. Feb. 29, 2024), adopted by text order (D.R.I. Mar. 25, 2024); Shaniece D. o/b/o A.D., 2024 WL 79897, at *2; Christina B., 2020 WL 5848732, at *7.

no error in this aspect of the ALJ's determination.  See Shaniece D. o/b/o A.D., 2024 WL 79897, at *4 (no error when ALJ's decision rests on substantial evidence including non-examining expert findings interpreting teacher questionnaire responses in context of complex record); Costa v. Colvin, No. CV 15-540ML, 2016 WL 7974120, at *6-7 (D.R.I. Dec. 21, 2016), adopted, 2017 WL 354284 (D.R.I. Jan. 24, 2017) (no error where non-examining expert interpreted complex teacher questionnaire responses in context with other evidence, and ALJ relied on substantial evidence including expert's findings).

Somewhat more substantively, Plaintiff challenges the ALJ's fifth-domain finding that, apart from the problems with self-care reported by the teacher and "some concerns regarding his ability to keep himself safe," "[n]o other deficits were noted in the household." Tr. 22 (emphasis supplied).[3]  Plaintiff contends that this finding is squarely contradicted by the mother's statements in the function report that Plaintiff is incapable, for example, of dressing, hygiene and obeying safety rules, Tr. 208; by the mother's testimony at the hearing that Plaintiff puts his clothes on backwards and shoes on the wrong feet and is aggressive, throwing chairs and expressing himself physically, Tr. 47-51; by the after-school/summer camp records reflecting that Plaintiff had serious behavioral issues during the YMCA programs from July 2022 through January 2023, Tr. 310-21; and by the CCAP mental health treatment records from June 2022, which reflect occasional bed-wetting and more bad days than good, Tr. 749, 761-62.

I consider each of these in turn, focusing first on the mother's subjective statements, which the ALJ found to be "not entirely consistent with the medical evidence and other evidence of record."  Tr. 21.  Thus, in the function report, the mother alleged that Plaintiff was completely

---

[3] The Court notes that the ALJ did not find that there was no evidence of "deficits in the household." Thus, Plaintiff's argument is that the issues and concerns impacting the self-care domain on which he now relies are materially different from the safety/self-care issues that the non-examining psychologists examined as foundational to their findings and that ALJ acknowledged in rendering his decision.

9

incapable of dressing, performing any hygiene functions, feeding himself with utensils, picking up toys, and obeying safety rules, Tr. 208.  The problem with Plaintiff's reliance on these statements is that they were reviewed by the non-examining experts, both of whom found that they are only partially consistent with the total evidence of record.  Tr. 81, 85, 92.  Further, the non-examining psychologist at reconsideration expressly noted records contemporaneous with the function report in which – directly contrary to her statements in support of Plaintiff's application – the mother reported to providers that Plaintiff was "[d]oing well, mother denies concerns related to sleep, eating or behavior."  Tr. 89 (referencing Tr. 719-35); see Tr. 82 (referencing Tr. 699 ("Mom stated his behavior at home has been 'fine'")).  In addition, the record is replete with other substantial evidence directly contradicting the mother's statements.  See, e.g., Tr. 338 ("Parent/CG has no concerns at this time . . . no daytime accidents . . . Patient can dress without supervision"); Tr. 487-88 (no safety concerns observed or reported by parent; as observed by provider: "[w]hen prompted to clean up, [Plaintiff] was able to do so and transitioned out of session easily").  Nor is there any evidence supportive of the mother's statement that Plaintiff was incapable of basic hygiene.  E.g., Tr. 362 (Plaintiff "[b]rushing teeth twice a day"); Tr. 719 (provider places no checks on need for education *inter alia* regarding personal hygiene).  The mother's report to a provider in mid-2020 that "Patient can dress without supervision" squarely contradicts the mother's hearing testimony that Plaintiff puts his clothes on backwards and puts his shoes on the wrong feet, Tr. 47-48.  And the mother's hearing testimony about her son's aggressiveness (throwing objects and expressing himself physically), Tr. 50-51, is consistent with and supportive of the findings of the non-examining experts in that they expressly considered that Plaintiff was having "periodic tantrums at home and at school," Tr. 84, 91, as well as such evidence as "bangs into walls w/ body . . . throws toys hits screams yells

10

temper tantrums," Tr. 389, and the mother's report that Plaintiff "is running around classroom, yelling and pushing chairs/tables," Tr. 702.

      I find no error in the ALJ's approach to these subjective statements. And consistent with the ALJ's well-supported determination to discount the mother's subjective statements and to rely instead on the contrary evidence cited above, coupled with the many provider findings of no observation or report from the mother of safety concerns, e.g., Tr. 483 ("mom did not report concerns that he may harm himself or others"), Tr. 750 ("Mom reports that [Plaintiff] has come a long way . . . S/I, H/I or safety risks denied . . . Mom does not report and . . . safety risk at this time."), I also find no error tainting the ALJ's sentence in the fifth-domain portion of the decision that, "[n]o other deficits were noted in the household." Tr. 22.

      Plaintiff's request that the Court focus on the CCAP treatment records from 2022, is equally unavailing. While the references to which Plaintiff points (occasional bed-wetting and more bad days than good) certainly appear in these records, overall, they are entirely supportive of and consistent with the ALJ's findings, including as to the fifth domain. See, e.g., Tr. 767 ("Mom reports improvement in ADHD symptoms since the medication adjustments last visit. There have been days when he has been off but as per mom, those are usually in response to disturbance in his routine. Overall doing well . . . S/I, H/I or safety risks denied"); Tr. 782 ("[n]o safety concerns observed or reported"); Tr. 789 ("Mom reports that [Plaintiff] does well in school when he is on meds . . . he is calm, focused, gets his work done and listens to teachers and mom. He gets along better with peers and siblings on meds."). Indeed, in one of the specific records that Plaintiff highlights, the provider also wrote that, "Mom does not have any concerns." Tr. 761. Thus, all of this evidence is consistent with and supportive of the ALJ's sentence that "[n]o other deficits were noted in the household." Tr. 22.

11

That leaves the YMCA afterschool/summer camp records. Although these were not provided to the ALJ until the hearing itself, the decision includes a specific discussion of them. Tr. 35. They consist of behavior warnings and bus incident reports, which reflect that Plaintiff had nine reports of behavioral issues (<u>e.g.</u>, hitting his brother; hitting a staffer; refusing to clean up or transition from activities; throwing an object and kicking when staff tried to intervene; and, five reports of seriously misbehaving on the bus) during YMCA programs from July 2022 through January 2023. Tr. 310-21. During the same period that YMCA staff were making these reports regarding intermittent instances of tantrums and misbehavior, Plaintiff was also being observed and assessed by the mental health and educational professionals. As the ALJ appropriately noted, these records include Plaintiff's IEP, which reflects that Plaintiff was doing a "better job at controlling his behavior and emotions recently . . . [and] can sit safely, participate and complete work in the classroom." Tr. 24 (referencing Tr. 298, 302). The ALJ also relied on the treating records from CCAP for the same time period, which reflect that Plaintiff's mother made the treating professionals aware of the YMCA behavioral issues; at that session, the provider's notes reflect:

> [Plaintiff] was in positive space and engage in session. [Plaintiff was polite and listen to directions. [Plaintiff] struggled with the transition at the end of session but was able to listen with minimal prompts. . . . <u>No current safety concerns reported or observed</u>.

Tr. 785-86 (emphasis supplied). Thus, I find that the 2022 YMCA behavioral reports are not materially different from the evidence of tantrums and difficulty with transition that the non-examining experts considered before finding that Plaintiff's limitations in the fifth domain are less than marked. I further find that there is no error in the ALJ's finding that the prior administrative findings are "in line with" this post-file-review evidence, Tr. 24, as well as that

the ALJ's sentence – that "[n]o other deficits were noted in the household" – is well-supported by substantial evidence. I do not recommend remand for further consideration of it.

### IV. Conclusion

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion to Affirm the Commissioner's Decision (ECF No. 12) be GRANTED.

Any objections to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen days of service of this report and recommendation. See Fed. R. Civ. P. 72(b); DRI LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See Brenner v. Williams-Sonoma, Inc., 867 F.3d 294, 297 n.7 (1st Cir. 2017); Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 20, 2024